UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
MELTZER, LIPPE, GOLDSTEIN &
BREITSTONE, LLP,

       Plaintiff,     FINDINGS OF FACT
               AND CONCLUSIONS OF LAW
               16-cv-1637 (DRH)(ARL)

  -against-

JAMES MALFETTI doing business as
MANAGEMENT RECRUITERS OF
UNION COUNTY, NJ,

       Defendant.
--------------------------------------------------------x
**APPEARANCES**

**MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP**
Attorneys for Plaintiffs
190 Willis Avenue
Mineola, New York 11501
By: Stephanie Marie Suarez, Esq.
   Thomas J. McGowan, Esq.

**BARTON LLP**
Attorneys for Defendants
420 Lexington Avenue, 18th Floor
New York, New York 10170
By: Randall L. Rasey, Esq.
   Roger E. Barton, Esq.
   Willliam Kang, Esq.

**HURLEY, Senior District Judge:**

      Plaintiff Meltzer, Lippe, Goldstein & Breitstone, LLP ("Meltzer Lippe") brought

this action in state court against defendant James Malfetti, doing business as Management

Recruiters of Union County, NJ ("Management Recruiters"), for a declaratory judgment.

Management Recruiters removed the action to this court based on diversity jurisdiction.  The late

Senior United States District Judge Leonard D. Wexler conducted a bench trial on January 29, January 31, and February 7, 2018. Upon Judge Wexler's death after the trial, the action was reassigned to me. Pursuant to Rule 63 of the Federal Rules of Civil Procedure, the parties were given an opportunity to recall any witnesses. Neither party has chosen to do so. Upon review of the record, I certify familiarity with it, and determine that the case may be completed without prejudice to the parties based on the present record. Accordingly, the purpose of this decision is to provide my Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52.

## I. FINDINGS OF FACT

### A. The Parties and Their Agents

1. Plaintiff Meltzer Lippe is a law firm organized as a New York limited liability partnership, with its primary office located at 190 Willis Avenue, Mineola, New York. (Stip. Facts, Joint Pre-Trial Order [DE 37] (March 9, 2017) (hereinafter "Stip. Facts") ¶ 1.)

2. Defendant Management Recruiters is a sole proprietorship owned by James Malfetti, located in Union County, New Jersey, and is engaged in the business of recruiting and placing attorneys and other professionals with law firms and other businesses. (Stip. Facts ¶ 2.)

3. Dawn Laffin ("Laffin") is Meltzer Lippe's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"). (Stip. Facts ¶ 4; Trial Tr. (hereinafter "Tr.") 21-22.)

4. Lew Meltzer, Esq. ("Lew Meltzer") was an equity partner, chairman, and, until January 1, 2018, the managing partner of Meltzer Lippe. (Stip. Facts ¶ 5; Tr. 176.)

5. David Heymann, Esq. ("Heymann") is an equity partner and, since January 1, 2018, managing partner of Meltzer Lippe. (Stip. Facts ¶ 6; Tr. 176.)

6. Joshua Ben-Asher ("Ben-Asher") is an attorney recruiter employed by Management Recruiters. (Stip. Facts ¶ 7.)

B. <u>The Parties' Fee Agreement</u>

7. On August 3, 2015, Laffin solicited Ben-Asher by email to engage him to recruit and place attorneys with Meltzer Lippe. (Tr. 22, 275; Pl. Ex. 5; Def. Ex. A.)

8. Ben-Asher responded by email, and on August 4, 2015, Laffin and Ben-Asher discussed the proposed engagement by telephone. (Tr. 275-76; Def. Ex. A.)

9. Laffin told Ben-Asher that Meltzer Lippe was looking for a labor attorney, discussed with him the firm's hiring needs, and asked him if he could help search for attorneys. (Tr. 22, 276.)

10. Laffin had previously worked with multiple professional recruiters in her capacity as an officer of Meltzer Lippe. (Tr. 21-22.)

11. Ben-Asher told Laffin that in the event Management Recruiters successfully placed an attorney with Meltzer Lippe, Meltzer Lippe would be required to pay a placement fee equal to 25 percent of that attorney's first-year base compensation, a standard compensation rate for placement of attorneys by professional recruiters. (Tr. 276, 287-89.)

12. Ben-Asher told Laffin that Management Recruiters' terms of engagement included a 90-day replacement credit guarantee, meaning that if a placed attorney resigned within that period, Management Recruiters would provide the firm a credit toward the placement fee for another attorney for the same position, a common and standard term for professional recruiters who place attorneys. (Tr. 276, 278.)

13.  Ben-Asher told Laffin that Management Recruiters' invoices would be payable within 15 days of receipt.  (Tr. 350.)

14.  Laffin asked Ben-Asher for a six-month replacement credit guarantee, rather than 90-day replacement credit guarantee; Ben-Asher agreed and told Laffin that he would make that change to Management Recruiters' standard fee agreement and send it to her by email.  (Tr. 279-80.)

15.  After their telephone conversation on August 4, 2015, Ben-Asher sent Laffin an email with an attachment in PDF format entitled "Fee Agreement — Meltzer Lippe.pdf," stating in the email text, "I've attached our fee agreement, as per our discussion, to this e-mail for your review.  Please let me know if you have any questions."  (Tr. 24-25, 281; Def. Ex. A.)

16.  The attachment (hereinafter "Fee Agreement") was a one-page document addressed to Laffin at Meltzer Lippe, dated August 4, 2015, bearing Ben-Asher's electronic signature on behalf of Management Recruiters.  (Def. Ex. A.)

17.  The attachment included the terms which Laffin and Ben-Asher had discussed by telephone, including: (1) the contingent compensation that would be due for placement of an individual attorney, equal to 25 percent of the placed attorney's first year base compensation; (2) the six-month replacement credit guarantee, in lieu of Management Recruiters' standard 90-day replacement credit guarantee; and (3) the requirement that payment would be due within 15 days of the invoice date in order to be eligible for the replacement credit guarantee.  (Def. Ex. A.)

18.  Under the heading "Fee Schedule," the attachment included the following language:

> This schedule is being sent to you to confirm our mutual understanding that our service fees are on a contingency basis and are payable only if you employ a candidate that has been referred to you, directly or indirectly, through our efforts. The fee is payable should you or your affiliate engage that candidate for any position within one year after our most recent communication relating to such candidate.

(Def. Ex. A, at D000012.)

19. In addition, the attachment included a section entitled "Placement Fee for Group Placements," which provided:

> For the purposes of this agreement, a Group is defined as two or more attorneys from the same law firm who we place with your organization as part as [sic] one transaction. In the event that we place a Group in your organization, our fee shall be calculated as follows:

| TOTAL COMBINED COMPENSATION | PERCENTAGE |
|---|---|
| First $400,000 | 25% |
| Next $400,000 | 20% |
| Above $800,000 | 18% |

(Def. Ex. A, at D000012.)

20. In an August 5, 2015 email in reply to Ben-Asher's August 4 email, Laffin responded: "This is fine – providing the Invoices are emailed to me. Any word on the labor atty?" Laffin's reply email included her signature block containing her full name and title, and Meltzer Lippe's name, address, and telephone and fax numbers. (Tr. 25, 289; Def. Ex. B.)

C. Initial Placements Under the Fee Agreement

21. After Laffin had assented to the Fee Agreement, Ben-Asher began introducing attorney candidates to her for consideration for placement at Meltzer Lippe in response to her requests. (Tr. 290-91.)

22.  Meltzer Lippe hired two attorneys introduced by Ben-Asher, one starting September 9, 2015, and the other November 30, 2015.  (Tr. 292-95.)

23.  Ben-Asher invoiced Meltzer Lippe for the placement fee due for each attorney under the Fee Agreement, and Meltzer Lippe timely paid each invoice; both placed attorneys remained employed by Meltzer Lippe beyond the six-month replacement credit guarantee period.  (Tr. 292-95; Def. Exhs. C, M.)

24.  In each of the two invoices, Management Recruiters mistakenly did not change the standard reference to the 90-day replacement credit guarantee to the longer, six-month replacement credit guarantee reflected in the Fee Agreement; Laffin did not notice the error when she received the invoices, and accordingly directed Meltzer Lippe's staff to pay each of the invoices without regard to the error, and without informing Ben-Asher of the error.  (Tr. 72-77, 293-97; Def. Ex. C, M.)

D.  Meltzer Lippe's Request for Placement of a Health Care Law Practice Group

25.  By email dated September 28, 2015, Laffin asked Ben-Asher to search for a "Healthcare boutique firm or dept," which, she stated, Meltzer Lippe wanted "to add . . . to our firm."  (Tr. 31, 139, 297; Def. Ex. D.)

26.  When Laffin asked Ben-Asher to search for a health care law group, she believed that if Ben-Asher successfully placed such a practice group with Meltzer Lippe that the placement would fall under her "prior understanding" with Ben-Asher regarding placement fees that would be due to Management Recruiters.  (Tr. 78.)

27.  When Ben-Asher received Laffin's request for him to search for a health care law group, he understood that it fell under the "Group Placements" fee schedule in the Fee

Agreement between Management Recruiters and Meltzer Lippe.  (Tr. 298-99; Def. Ex. A, at D000012.)

28.  In response to Laffin's request, Ben-Asher identified and reached out to various health care law firms and department heads to find an interested group of attorneys.  (Tr. 297-98.)

E.  Management Recruiters Introduces Kern Augustine to Meltzer Lippe

29.  Ben-Asher identified Kern Augustine Conroy & Schoppmann, PC ("Kern Augustine"), a health care law firm with its main office in New Jersey and a second office in Westbury, New York, as a potential candidate for Meltzer Lippe, and secured the interest of Kern Augustine's principal, Michael Schoppmann ("Schoppmann").  (Tr. 299-301.)

30.  On October 14, 2015, Ben-Asher told Laffin by email that he "may have just hit a home run on the search for a health care group."  (Tr. 301-02; Def. Ex. G.)

31.  Laffin expressed interest, and Ben-Asher had Meltzer Lippe execute a non-disclosure agreement that Schoppmann required before Ben-Asher could identity Kern Augustine as a merger candidate to other law firms.  (Tr. 301-03; Def. Ex. H.)

32.  Ben-Asher then identified Kern Augustine to Meltzer Lippe, and worked with Laffin and Schoppmann's assistant to organize and schedule an initial meeting between Schoppmann, Lew Meltzer, and Laffin; that initial meeting took place on November 3, 2015.  (Tr. 303-05; Def. Ex. I.)

33.  At the November 3, 2015 meeting, Schoppmann told Lew Meltzer and Laffin that he was the sole shareholder of Kern Augustine — a New Jersey professional corporation — that he planned to leave that firm and its health care law practice, and that he wished to sell Kern

Augustine as an ongoing law practice; Lew Meltzer and Laffin responded to Schoppmann that Meltzer Lippe was interested in purchasing Kern Augustine from him.  (Tr. 32-33, 305-06.)

34.  Ben-Asher also assisted in organizing a second meeting, held on November 30, 2015 and attended by attorneys from Kern Augustine and Meltzer Lippe, for the purpose of exploring whether Kern Augustine's "practice fit with" Meltzer Lippe's; after that meeting, Meltzer Lippe continued to pursue the acquisition of Kern Augustine.  (Tr. 306-07, Def. Exs. K, L.)

F.  The Kern Augustine Transaction

35.  Meltzer Lippe sought to acquire Kern Augustine because of the perceived value of Kern Augustine's lawyers and their health care law practice, as Kern Augustine otherwise had no significant value.  (Tr. 41.)

36.  Meltzer Lippe was interested in preserving the "Kern Augustine" name, which it believed had brand recognition in the health care industry, and Schoppmann's counsel suggested that Meltzer Lippe might operate Kern Augustine as a subsidiary, enabling it to maintain the name "Kern Augustine."  (Tr. 95-96; Def. Ex. X.)

37.  At one point Schoppmann was looking for as much as $1 million for Kern Augustine, but Meltzer Lippe ultimately found that price to be too high because of more than $2 million of liabilities, which would stay with Kern Augustine after Schoppmann left the firm.  (Tr. 36, 98-105, 140; Pl. Ex. 9, at P00213.)

38.  Meltzer Lippe then contemplated purchasing Schoppman's shares in Kern Augustine, but, in or around mid-January 2016, Meltzer Lippe became concerned that New Jersey law might prohibit Meltzer Lippe, as a New York limited liability partnership, from

purchasing the shares of Kern Augustine, a New Jersey professional corporation; as a result, Meltzer Lippe considered having one or more of its New Jersey-admitted equity partners purchase Schoppmann's Kern Augustine shares.  (Tr. 35, 324-26; Pl. Ex. 7; Def. Ex. R.)

39.  Eventually, Lew Meltzer agreed that Heymann, who was admitted in New Jersey, rather than Meltzer Lippe, would purchase Schoppmann's shares of Kern Augustine, for $40,000.  (Tr. 37, 90, 153.)

40.  Despite Laffin's and Heymann's testimony that Heymann asked Lew Meltzer if he could purchase the Kern Augustine shares as a personal investment only *after* Meltzer Lippe had already decided not to acquire Kern Augustine, the evidence at trial shows that Meltzer Lippe considered acquiring Kern Augustine through one or more of its partners *before* it was decided that Heymann would purchase the shares.  (Tr. 37, 90, 153; Pl. Ex. 7; Def. Exs. P, Q, T, X.)

41.  Lew Meltzer and Laffin remained closely involved in negotiating and closing the transaction with Schoppmann, his counsel, and Kern Augustine's bank, even after it purportedly had been decided that Heymann, rather than Meltzer Lippe, would purchase the Kern Augustine shares.  (Tr. 113-17; Def. Exs. FF, GG, HH, II, LL.)

42.  The transaction closed on February 24, 2016 (the "Kern Augustine Transaction"), pursuant to which Heymann paid Schoppmann $40,000 to acquire the shares of Kern Augustine.  (Pl. Ex. 9.)

43.  Heymann did not assume personal responsibility for any of the debts and liabilities that remained with Kern Augustine after the Kern Augustine Transaction, with the exception of the wages of Kern Augustine's attorneys and other employees, for which he was

personally liable as a matter of law due to his ownership of the professional corporation. (Tr. 57, 156, 159-60, 200-02.)

44.   Meltzer Lippe did not itself directly purchase Kern Augustine because it determined that, as a New York limited liability partnership, it was prohibited by New Jersey statute from owning Kern Augustine, a New Jersey professional corporation. (Compl. Ex. 2 to Notice of Removal [DE 1-2] ¶ 10; Tr. 35-36, 219.)

45.   On January 21, 2016, Laffin reported to Ben-Asher that Meltzer Lippe was "definitely taking" nine Kern Augustine attorneys with total salaries of $1,344,000, and was "not taking" four attorneys with total salaries of $690,000. (Def. Ex. U, at P03247.)

46.   When the Kern Augustine Transaction closed on February 24, 2016, however, all 13 Kern Augustine attorneys stayed. (Tr. 125-26, 130-31.)

47.   Prior to the Kern Augustine Transaction, the salaries of two of those attorneys increased by a total of $65,000. (Def. Ex. LL.)

48.   Following the Kern Augustine Transaction, the total amount of the salaries of the 13 Kern Augustine attorneys was $2,099,000. (Tr. 125-26, 130-31; Def. Ex. LL; Def. Ex. U, at P03247.)

G.   Kern Augustine's "Alliance" with Meltzer Lippe

49.   Soon after the Kern Augustine Transaction closed, Heymann authorized Kern Augustine to issue a press release dated March 7, 2016, announcing that "KERN AUGUSTINE HAS FORMED AN ALLIANCE WITH MELTZER LIPPE"; the press release included the following quoted statement from Lew Meltzer: "'We are extremely excited about our relationship with Kern Augustine', said Lew Meltzer, Chairman of Meltzer Lippe. 'Partnering

our knowledge base of tax, corporate, real estate plus planning for high net worth individuals, construction and employment law with healthcare law, truly benefits both firms.'" (Def. Ex. RR; Tr. 171-173, 179-80.)

50. Heymann was identified on Kern Augustine's website as "Of Counsel," but was not identified as a shareholder or owner of Kern Augustine. (Tr. 183; Def. Ex. VV.)

51. On February 25, 2016, following the closing of the Kern Augustine Transaction, Lew Meltzer, Laffin, and Heymann traveled to Kern Augustine's offices in Bridgewater, New Jersey, for a meeting with all of Kern Augustine's attorneys; at the meeting, they announced the sale of Kern Augustine. (Tr. 174-75, 227-29.)

52. At the February 25, 2016 meeting, Lew Meltzer told Kern Augustine's attorneys that their firm was now associated with Meltzer Lippe, discussed Meltzer Lippe's expansion into health care law and into New Jersey, and explained that Heymann had actually purchased the shares of Kern Augustine because they needed a New Jersey-admitted attorney to own Kern Augustine. (Tr. 229-30.)

53. Laffin and Heymann also spoke at the February 25 meeting, with Laffin explaining that she would manage both Kern Augustine and Meltzer Lippe, and Heymann talking briefly about himself, without indicating that he would have any role in managing Kern Augustine. (Tr. 229-31.)

54. Sometime after the February 25, 2016 meeting, a second meeting of Kern Augustine and Meltzer Lippe attorneys was held at Meltzer Lippe's offices in Mineola; at the second meeting, various Meltzer Lippe partners described their practice areas, and each of the Kern Augustine attorneys introduced themselves. (Tr. 231-32.)

55.  Upon the closing of the Kern Augustine Transaction, Laffin assumed responsibility for the operational management and administration of Kern Augustine, which included designation as Kern Augustine's Treasurer and the authority to sign checks; these new roles were in addition to her responsibilities as CFO/COO of Meltzer Lippe.  (Tr. 44, 93-94, 160, 163-64, 230, 386-87.)

56.  Laffin communicated directives with Kern Augustine employees through her Meltzer Lippe email address.  (Tr. 230.)

57.  Kern Augustine ostensibly engaged Laffin's services through a company of which Laffin was the sole owner, DML Consultants LLC ("DML Consultants"), pursuant to a "Services Agreement" dated February 24, 2016, the same date as the Kern Augustine Transaction.  (Def. Ex. NN.)

58.  Laffin's and DML Consultants' net compensation from Kern Augustine for Laffin's services, for the period from February 24, 2016 until Kern Augustine ceased its law practice in August 2017, was at least $20,000, while Meltzer Lippe paid her around $175,000 annually as its CFO/COO.  (Tr. 92-94, 160, 386-87.)

59.  A few months after the Kern Augustine Transaction, the Kern Augustine attorneys who had been working in Kern Augustin's Westbury offices were moved into offices leased to Kern Augustine by Meltzer Lippe in Meltzer Lippe's building in Mineola.  (Tr. 44-45, 148-49, 232-34.)

60.  Kern Augustine's attorneys' individual offices were located next to those of Meltzer Lippe attorneys, though no signs in the Kern Augustine attorneys' offices indicated that they were with a different law firm; however, Kern Augustine attorneys continued to use Kern

Augustine's separate telephone system, email server, and billing software, and the "Kern Augustine" name was included in the building's directory.  (Tr. 233-34.)

61.  One Kern Augustine attorney, Stuart Weichsel ('Weichsel"), testified that after moving into Meltzer Lippe's offices, he communicated regularly with and worked on various matters for Meltzer Lippe's attorneys; Weichsel did not seek any advance permission from anyone at Kern Augustine before doing so, and was told to email his time billed for such matters to a Meltzer Lippe employee who would input his time into Meltzer Lippe's billing software.  (Tr. 238-39.)

62.  Heymann testified that he was not aware that Weichsel had performed work on Meltzer Lippe matters while ostensibly employed by Kern Augustine, and that he did not receive any explanations or reports regarding how much time Kern Augustine attorneys were spending on Meltzer Lippe matters.  (Tr. 187-88.)

63.  Heymann testified that in or around August 2016, he agreed to transfer Weichsel from Kern Augustine to Meltzer Lippe because Kern Augustine did not have enough billable work for him and Meltzer Lippe needed a tax attorney.  (Tr. 203.)

64.  An administrative employee of Meltzer Lippe told Weichsel that he was being transferred to Meltzer Lippe; Weichsel had not previously been told that his employment by Kern Augustine would be terminated, and he received no offer from Meltzer Lippe.  (Tr. 243-44.)

65.  Thereafter, Weichsel maintained his Kern Augustine email account and access to Kern Augustine's billing software and voicemail; Weichsel continued to perform work

for Kern Augustine clients, which he billed through Kern Augustine's billing software, while also performing work for Meltzer Lippe, which was billed through Meltzer Lippe. (Tr. 245-47.)

H. <u>Meltzer Lippe's Refusal to Pay Management Recruiters</u>

66. On September 28, 2015, when Laffin asked Ben-Asher to expand his attorney search to include a health care law practice group or firm for Meltzer Lippe, Meltzer Lippe had already paid Management Recruiters attorney placement fees under the Fee Agreement. (Tr. 69-70; Def. Ex. C.)

67. Both Laffin and Ben-Asher understood at that time that if he were successful in placing a health care law practice group or firm with Meltzer Lippe, Management Recruiters would be entitled to a placement fee under the Fee Agreement. (Tr. 78, 298-99.)

68. Laffin learned at her and Lew Meltzer's first meeting with Schoppmann on November 3, 2015 that Schoppmann wished to sell Kern Augustine and leave the firm, and Laffin promptly informed Ben-Asher of that, but did not mention the Fee Agreement or the potential placement fee. (Tr. 32-33, 305-06.)

69. During the next two months, Laffin continued to work with Ben-Asher to schedule additional meetings with Schoppmann and Kern Augustine's attorneys and to update Ben-Asher on the progress of the negotiations, without ever indicating to him that Meltzer Lippe might not pay Management Recruiters a placement fee for Kern Augustine under the Fee Agreement. (Def. Exs. K, L, N.)

70. On January 15, 2016, Ben-Asher and Laffin met in person, for the first time, at Meltzer Lippe's offices in Mineola; at that meeting, Ben-Asher told Laffin that he hoped that

Meltzer Lippe would work out an agreement with Schoppmann to acquire Kern Augustine, and that it would be great for him and Meltzer Lippe if that happened. (Tr. 308-10.)

71. On January 19, 2016, Laffin told Ben-Asher by email, for the first time, that "[m]ost likely one or more of our partners" would purchase Kern Augustine, and asked him to explain what Management Recruiters' fee would be; Ben-Asher responded by asking Laffin, "do you know what the attorney salaries would be?" and reminding her that "[t]he fee would be based on the attorneys' salaries." (Tr. 82-84, 311-15; Pl. Ex. 7; Def. Ex. T.)

72. Shortly thereafter, Laffin and Ben-Asher spoke by telephone, and Laffin suggested for the first time that Meltzer Lippe thought it might be appropriate to pay Management Recruiters as a "business broker," as the Kern Augustine Transaction was a sale not a placement, and that an appropriate "business broker" fee might be eight to ten percent of the purchase price; in response, Ben-Asher told Laffin that he was not a "business broker." (Tr. 132, 310-11.)

73. Ben-Asher told Laffin that Management Recruiters' fee would be determined under the "Group Placements" provision in the Fee Agreement, and the credible evidence shows that Laffin did not object to the Group Placements fee provision, but asked him to consider reducing Management Recruiters' placement fee in order to facilitate the closing of the Kern Augustine Transaction. (Tr. 128-29, 319-21.)

74. On January 21, 2016, Marianne Ytuarte "(Ytuarte")", an employee in Meltzer Lippe's accounting department, emailed Ben-Asher asking for a copy of the Fee Agreement, which Ben-Asher promptly emailed to her. (Tr. 315-16; Def. Ex. V.)

75. Also on January 21, 2016, around 20 minutes after Ben-Asher sent a copy of the Fee Agreement to Ytuarte, he followed up with Laffin by email, asking her again for the salaries of the Kern Augustine attorneys who would remain after the Kern Augustine Transaction, adding "I'd like to be able to calculate a more accurate frame of reference on the fee." (Tr. 316-18; Def. Ex. U, at P03248.)

76. Laffin responded by email 11 minutes later, telling Ben-Asher that Meltzer Lippe was "definitely taking" nine attorneys with combined salaries totaling $1,344,000, and was "not taking" four attorneys with combined salaries totaling $690,000. (Def. Ex. U, at P03247.)

77. In response, Ben-Asher explained to Laffin that the fee calculation under the Group Placements fee provision would be $277,920, and told her that Management Recruiters was willing to discount the fee to $235,000 "to get this deal done with Kern Augustine." (Def. Ex. U, at P02346-47; Tr. 128-30, 319-20.)

78. On January 26, 2016, Laffin told Ben-Asher that Schoppmann had rejected their offer for Kern Augustine, and that she suspected he had a better offer from another firm; when Ben-Asher suggested a way to revive the negotiations, Laffin told him he was "beating a dead horse." (Def. Ex. BB, at P0124-25; Tr. 97-98; 323-24.)

79. On the morning of January 27, 2016, Ben-Asher told Laffin by telephone that he had learned that, contrary to what Meltzer Lippe had been led to believe, Schoppmann in fact had no other offer for Kern Augustine; Laffin promptly contacted Schoppmann and the negotiations continued, a development that Laffin did not disclose to Ben-Asher. (Tr. 327-28.)

80.  Ben-Asher heard nothing further from Laffin about Kern Augustine until February 17, 2016, when Laffin told him by email:

> It now looks like a partner of Meltzer Lippe may be acquiring the stock of Kern Augustine.  If you believe you are entitled to a commission please send me a letter or email explaining what you believe you are entitled to and why.

(Def. Ex. JJ, at P01500; Tr. 329-31.)

81.  The following day, February 18, 2016, Ben-Asher sent Laffin the written explanation she had requested, telling her that he understood from her that "a partner of your firm intends to purchase the stock of [Kern Augustine], continue running [Kern Augustine] through a management company, and eventually fold [Kern Augustine] into Meltzer Lippe in the coming years."  (Def. Ex. KK, at P01487-88.)

82.  Laffin responded that "[w]e had no such discussion.  I only told you that a partner of my firm may be purchasing the stock of Kern Augustine."  (Def. Ex. KK, at P01486-87.)

83.  Ben-Asher responded that "the purchase of [Kern Augustine] by a partner affiliated with your firm" was encompassed by the Fee Agreement's provision requiring payment of the placement fee if introduced attorneys were engaged by an affiliate of Meltzer Lippe; Ben-Asher then provided the same fee calculation which he had previously provided, and restated that Management Recruiters was willing to discount its' fee by 15 percent, to $235,000.  (Def. Ex. KK, at P01487-88.)

84.  On the morning of February 19, 2016, Meltzer Lippe partner Ira Halperin ("Halperin") called Ben-Asher by telephone and told him that Meltzer Lippe was willing to pay Management Recruiters no more than $40,000 for Kern Augustine, although Halperin did not

deny that Meltzer Lippe had entered into the Fee Agreement with Management Recruiters. (Tr. 296.)

85. According to Ben-Asher, Halperin told him that the Fee Agreement was "not valid" due to the error in Management Recruiters' prior two invoices to Meltzer Lippe, specifically, the mistaken reference to the standard 90-day replacement credit guarantee instead of the six-month replacement credit guarantee Laffin had negotiated; this was the first time that anyone from Meltzer Lippe made Ben-Asher aware of that error. (Tr. 296-97.)

86. Halperin told Ben-Asher that if Management Recruiters was not willing to accept $40,000, they could sue Meltzer Lippe for their placement fee. (Tr. 296.)

I. The Present Action

87. About two weeks later, on March 8, 2016, Meltzer Lippe sued Management Recruiters in state court seeking a declaratory judgment that it is not required to pay Management Recruiters in connection with the Kern Augustine Transaction. (Complaint for Declaratory Judgment, Docket Entry 1-2.)

88. Management Recruiters removed the action to this Court, and then answered and asserted counterclaims for breach of contract, quantum meruit, and unjust enrichment. (Notice of Removal, Docket Entry 1; Answer and Counterclaims, Docket Entry 6.)

89. Meltzer Lippe answered the counterclaims and asserted various affirmative defenses to the counterclaims, including the statute of frauds. (Answer to Counterclaims, Docket Entry 36.)

## II.  DISCUSSION AND CONCLUSIONS OF LAW

### A.  Subject Matter Jurisdiction

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, as there is complete diversity of citizenship among the parties.  Defendant Management Recruiters is a sole proprietorship with its offices in New Jersey, and its principal James Malfetti resides in New Jersey.  Plaintiff Meltzer Lippe is a New York limited liability partnership with its offices located in New York State, and none of its partners resides in New Jersey.  (See Aff. in Response to Court's Order to Confirm Diversity Jurisdiction, sworn to on Jan. 31, 2017 [DE 34].)

### B.  Management Recruiters' Counterclaims and Meltzer Lippe's Defense

Management Recruiters maintains that it entered into a binding contract — the Fee Agreement — with Meltzer Lippe for the placement of attorneys with Meltzer Lippe, and therefore it is entitled to recover, for breach of contract, a placement fee under the Fee Agreement for placing 13 Kern Augustine attorneys with Meltzer Lippe.  Alternatively, Management Recruiters maintains that if the Court finds that the parties did not enter a binding agreement, it is entitled to recover for its services in connection with the Kern Augustine Transaction under the theory of quantum meruit and unjust enrichment.

Meltzer Lippe maintains that it did not enter into a binding agreement with Management Recruiters, and that, even if the Court finds that the parties entered into a binding agreement, the agreement is not enforceable under the statute of frauds.  Meltzer Lippe also maintains that the quantum meruit counterclaim is barred by the statute of frauds.

C.  Determining Choice of Law

A federal court sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state.  *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001); *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 137 (2d Cir. 1991).  Under New York law, the court need not conduct a choice-of-law analysis unless there is an actual conflict between the laws of the jurisdictions at issue.  *See Feiger*, 251 F.3d at 393; *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993).  The laws of New York and New Jersey are potentially applicable to the claims and defenses in this action.  Thus, the Court must determine whether there is an actual conflict between the laws of New York and New Jersey in its analysis of Management Recruiters' counterclaims and Meltzer Lippe's statute of frauds defense.

D.  Management Recruiters' Breach of Contract Counterclaim

1.  The Parties Entered Into the Fee Agreement

The parties do not suggest that a conflict exists between the laws of New York and New Jersey on the principles of contract formation.  "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.  That meeting of the minds must include agreement on all essential terms."  *Kolchins v. Evolution Mkts., Inc.*, 128 A.D.3d 47, 59 (1st  Dep't 2015) (internal citations omitted).  The acceptance must "be clear, unambiguous and unequivocal."  *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83-84 (2d Cir. 1998) (quoting *King v. King*, 208 A.D.2d 1143, 1144 (3d Dep't 1994)) (internal quotation marks omitted).  "The existence of a contract is not dependent on the subjective intent" of either party.  *Brown Bros. Elec. Contractors v. Beam*

*Constr. Corp.*, 41 N.Y.2d 397, 399 (1977).  Rather, "[i]n determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look . . . to the objective manifestations of intent of the parties as gathered by their expressed words and deeds."  *Id.* Moreover, it is well established in New York that an email exchange may create an enforceable contract.  *See, e.g.*, *Brighton Inv., Ltd. v. Har-Zvi*, 88 A.D.3d 1220, 1222 (3d Dep't 2011) ("[A]n exchange of e-mails may constitute an enforceable contract, even if a party subsequently fails to sign implementing documents, when the communications are sufficiently clear and concrete to establish such an intent." (internal quotation marks and citations omitted)); *Newmark & Co. Real Estate Inc. v. 2615 E. 17 St. Realty LLC*, 80 A.D.3d 476, 477–78 (1st Dep't 2011) ("The e-mail agreement set forth all relevant terms of the agreement, including the particular commission charged by plaintiff, and thus, constituted a meeting of the minds." (citation omitted)); *Kowalchuk v. Stroup*, 61 A.D.3d 118, 122 (1st Dep't 2009) ("Inasmuch as there was nothing unclear, ambiguous, or equivocal about plaintiffs' February 6 e-mail responding to defendant's offer, it constituted an effective acceptance.").

Here, the evidence establishes an enforceable contract — the Fee Agreement — between Meltzer Lippe and Management Recruiters for the placement of attorneys with Meltzer Lippe. Laffin solicited Ben-Asher to place attorneys with Meltzer Lippe, and the two discussed and negotiated the terms of the engagement, including compensation.  Ben-Asher told Laffin that he would send her a written agreement to review, and promptly did so.  Laffin, who had worked with multiple professional recruiters in her capacity as an officer of Meltzer Lippe, could not have reasonably misunderstood Ben-Asher's intent to create a binding agreement between Meltzer Lippe and Management Recruiters before he began introducing candidates to Meltzer

Lippe.  Laffin's testimony that she did not believe that her assent to that agreement actually created an enforceable agreement between Meltzer Lippe and Management Recruiters is not credible — nor does it preclude the formation of an enforceable contract.  See Brown Bros., 41 N.Y.2d at 399 ("The existence of a contract is not dependent on the subjective intent of either [party].").  Ben-Asher explicitly stated in his August 4, 2015 e-mail to Laffin that he was "attaching our fee agreement, per our discussion, to this e-mail for your review," and the attached document was entitled "Fee Agreement — Meltzer Lippe.pdf."  The document contained the essential terms necessary to constitute a contract, and included the six-month replacement credit guarantee which Laffin had negotiated with Ben-Asher when they discussed the contract terms by telephone.  The Fee Agreement plainly stated that it was sent "to confirm our mutual understanding" about how and when Meltzer Lippe would pay Management Recruiters a placement fee, and it bore Ben-Asher's signature.  Laffin unambiguously assented to the Fee Agreement, telling Ben-Asher in her August 5, 2015 reply email:  "This is fine – provided the invoices are emailed to me.  Any word on the labor atty?"  She thereby not only assented, she urged Ben-Asher to perform under the Fee Agreement, which he did by introducing a labor attorney candidate as they had previously discussed.  Notably, Laffin never denied the existence of the Fee Agreement between Meltzer Lippe and Management Recruiters before Meltzer Lippe filed this lawsuit.

Meltzer Lippe argues that no agreement was reached because Laffin did not sign the Fee Agreement.  Given the objective evidence, there was no requirement for Laffin to sign the Fee Agreement for it to be enforceable.  *See Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 369 (2005) ("[A]n unsigned contract may be enforceable, provided there is objective evidence

establishing that the parties intended to be bound."); *Newmark*, 80 A.D.3d at 477-78 ("Although defendant did not sign the separate brokerage agreement proffered by plaintiff setting forth the details of its commission, that fact is not fatal . . . to its enforceability.").  In any event, Laffin's signature block at the bottom of her reply email — containing her name, her job title, the Meltzer Lippe name, and her contact information — signified the authentication of her email.  *See Stevens v. Publicis S.A.*, 50 A.D.3d 253, 255–56 (1st Dep't 2008) ("The emails from plaintiff constitute 'signed writings' within the meaning of the statute of frauds, since plaintiff's name at the end of his email signified his intent to authenticate the contents." (citation omitted)); *Newmark*, 80 A.D.3d at 477 ("An email sent by a party, under which the sending party's name is typed, can constitute a writing for purposes of the statute of frauds.").

Meltzer Lippe further argues that Laffin's proviso in her reply email — "providing the invoices are emailed to me" — constituted a rejection and counteroffer.  To the contrary, this reply, viewed objectively, did not constitute a rejection of or counteroffer to the Fee Agreement, which was silent about how or to whom invoices would be delivered.  Where "'the acceptance of an offer is initially unconditional, the fact that it is accompanied with a direction or a request looking to the carrying out of its provisions, but which does not limit or restrict the contract, does not render it ineffectual or give it the character of a counteroffer.'"  *Krumme*, 143 F.3d at 83-84 (quoting *Valashinas v. Koniuto*, 283 A.D. 13, 17 (3d Dep't 1953), *aff'd*, 308 N.Y. 233, 239 (1954)).  Laffin's acceptance of the offer was unconditional and her proviso did not limit or restrict the contract.

Moreover, Laffin's conduct after her reply email evidenced her assent to the Fee Agreement on behalf of Meltzer Lippe.  *See Brown Bros.*, 41 N.Y.2d at 400-01; *see also John*

*William Costello Assocs., Inc. v. Standard Metals Corp.*, 99 A.D.2d 227, 331 (1st Dep't) (company's failure to object to written offer from employment agency and acceptance of its services manifested assent to terms of offer), *appeal dismissed*, 62 N.Y.2d 942 (1984). In this respect, Laffin proceeded to work with Ben-Asher on various attorney searches, resulting in Meltzer Lippe hiring two attorney candidates introduced by Management Recruiters. As to these two attorneys, Meltzer Lippe accepted Management Recruiters' invoices and paid the placement fees pursuant to the Fee Agreement, without objection. Laffin's and Meltzer Lippe's conduct reflect an objective manifestation of assent to the Fee Agreement and its terms.

There is no merit to Meltzer Lippe's suggestion that the mistaken reference in Management Recruiters' invoices to its 90-day replacement credit guarantee, rather than the agreed-upon six-month replacement credit guarantee, somehow rendered the Fee Agreement "not valid" or otherwise unenforceable, as stated by Meltzer Lippe partner Halperin. Laffin, who personally received both invoices, did not notice the error and instructed Meltzer Lippe's accounting department to pay the invoices regardless of it. No one from Meltzer Lippe made Ben-Asher aware of the error until Halperin raised it as an excuse for not paying Management Recruiters' placement fee a few days before the Kern Augustine Transaction closed. This unnoticed error does not provide Meltzer Lippe an excuse to avoid the binding agreement.

    2.  <u>The Kern Augustine Transaction is Encompassed in the Fee Agreement</u>

The Fee Agreement expressly contemplated that Management Recruiters might place a group of attorneys from the same law firm with Meltzer Lippe, and that Meltzer Lippe might engage introduced attorneys indirectly through an "affiliate," rather than hiring them directly. Specifically, the Fee Agreement states that Management Recruiters' placement "fee is payable

should *you or your affiliate* engage that candidate for any position." (Def. Ex. A, at D000012 (emphasis added).) The word "affiliate" is not defined in the Fee Agreement, and there is no credible evidence that the parties expressed contradictory understandings of this word upon entering into the Fee Agreement. Accordingly, under New York law, the word "should be given [its] plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks omitted). Courts in New York commonly refer to the dictionary to determine the plain meaning of words to a contract, *see Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011); *Mazzola v. Cty. of Suffolk*, 143 A.D.2d 734, 735 (2d Dep't 1988), including online dictionaries, such as Dictionary.com, *see, e.g., Eastman Kodak Co. v. Asia Optical Co.*, No. CV 11-6036, 2012 WL 917393, at *7 (S.D.N.Y. Mar. 16, 2012) (citing online Dictionary.com definition of "portfolio" to interpret contract), *aff'd*, 518 Fed. App'x 23 (2d Cir. 2013). Dictionary.com defines the noun "affiliate" as "a person who is affiliated," and the verb "affiliate" as "to associate oneself; be intimately united in action or interest." See Dictionary.com, http://dictionary.com/browse/affiliate (2018).

Heymann, as an equity partner of Meltzer Lippe, falls comfortably within the plain meaning of the word "affiliate," as one who is "united in action or interest" with Meltzer Lippe. Meltzer Lippe concluded that it was barred by New Jersey law from directly acquiring Kern Augustine, and therefore arranged for Heymann — who was licensed to practice law in New Jersey — to purchase Schoppmann's Kern Augustine shares. Heymann purchased the Kern Augustine shares in order for Meltzer Lippe to benefit from Kern Augustine's law practice; not merely as a personal investment, as Meltzer Lippe and Heymann misleadingly suggest.

Additionally, following the closing of the Kern Augustine Transaction, Kern Augustine and its law practice were managed, controlled, and exploited by Meltzer Lippe for Meltzer Lippe's benefit. Lew Meltzer, Meltzer Lippe's chairman and managing partner, remained actively involved in — if not instrumental to — the negotiation and closing of the Kern Augustine Transaction. Laffin too remained actively involved in the negotiation and closing of the Kern Augustine Transaction. After the closing, Laffin assumed operational management of Kern Augustine, in addition to Meltzer Lippe, and received only minimal additional compensation for concurrently managing both firms. The Kern Augustine Transaction was announced as the formation of an "alliance" between Kern Augustine and Meltzer Lippe, while no formal announcement or firm-wide effort was made to inform Kern Augustine's clients that Heymann had acquired the firm. The firms' respective attorneys were introduced to each other and encouraged to collaborate and to refer business to each other. Lew Meltzer even indicated to Kern Augustine's attorneys that the acquisition of their firm represented Meltzer Lippe's expansion into health care law. Kern Augustine's New York-based attorneys even moved into Meltzer Lippe's offices, and at least one Kern Augustine attorney worked on matters for both firms, before and after he was summarily transferred to Meltzer Lippe. Thus, notwithstanding that Kern Augustine nominally remained a separate legal entity with its own financial management, it too falls comfortably within the common definition of an "affiliate" of Meltzer Lippe.

Giving "full meaning and effect" to the Fee Agreement's provisions based on the "plain meaning" of the words used, the Fee Agreement provides for Meltzer Lippe to pay Management Recruiters a placement fee for the 13 placed attorneys who were engaged by and through a

Meltzer Lippe partner (Heymann) and a Meltzer Lippe-controlled entity (Kern Augustine). *See*

*LaSalle Bank*, 424 F.3d at 206. Under the Fee Agreement, Heymann's acquisition of Kern

Augustine and its law practice was a "Group Placement" with Meltzer Lippe or an affiliate,

obligating Meltzer Lippe to pay the placement fee to Management Recruiters.

E.  Meltzer Lippe's Statute of Fraud's Defense Fails

Meltzer Lippe argues that Management Recruiters' breach of contract claim is barred by

the New Jersey statute of frauds, N.J. Stat. Ann. § 25:1-16(c), which establishes that an

agreement to pay a commission to a "business broker" is enforceable only if it is memorialized in

a signed writing.[2] Management Recruiters responds that if any statute of frauds applied it would

be New York's statute of frauds, N.Y. Gen. Obl. Law § 5-701(a)(10),[3] not New Jersey's, but

that neither statute of frauds applies to a contract to pay for the services of a professional

---

[2]The New Jersey statute provides, in relevant part:

> [A] business broker is entitled to a commission only if before or after the sale of the business, the authority of the broker is expressed or recognized in a writing signed by the seller or buyer or authorized agent, and the writing states either the amount or the rate of commission.

N.J. Stat. Ann. § 25:1-16(c). The term "business broker" is defined as "a person who negotiates the purchase or sale of a business." *Id.* § 25:1-16(a).

[3]The New York statute provides that certain contracts are void unless "it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith," including

> a contract to pay compensation for services rendered in negotiating . . . the purchase . . . of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation . . . . "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation . . . .

N.Y. Gen. Obl. Law § 5-701(a)(10).

recruiter, under circumstances where it did not hold itself out as a "business broker" and did not seek entitlement to a commission for the "sale of a business." The Court agrees that neither of these statutes applies under the circumstances. As explained above, Management Recruiters is entitled to recover its Group Placement fee under the Fee Agreement for placing Kern Augustine attorneys. Meltzer Lippe did not engage Management Recruiters to help it buy a business. Rather, Laffin explicitly engaged Management Recruiters to identify and introduce a health care law practice group or boutique firm to add to Meltzer Lippe, an engagement objectively falling within the parties' Fee Agreement and, in particular, the Group Placements provision. It was only after Ben-Asher had identified and introduced Kern Augustine that Meltzer Lippe chose to structure its acquisition of Kern Augustine's health care law practice as a stock purchase, which was incidental to effectuating the service which Ben-Asher was engaged to, and did, perform. As Laffin testified, Kern Augustine had no significant value apart from its attorneys and their law practice, and the stock purchase was simply the means of acquiring them. As such, neither statute of frauds applies to Management Recruiters' entitlement to a fee for its services in placing these attorneys. *See Howard-Sloan Legal Search, Inc. v. Todtman, Young, Tunick, Nachnamie, Hendler & Spizz, P.C.*, 193 A.D.2d 404, 405 (1st Dep't 1993) ("General Obligations Law § 5-701(a)(10) does not apply to the services of employment agencies.").

F. Management Recruiters' *Quantum Meruit* and Unjust Enrichment Counterclaims

As noted above, Management Recruiters asserts counterclaims for *quantum meruit* and unjust enrichment as alternatives to its breach of contract counterclaim. Given the Court's conclusion that Management Recruiters is entitled to recover on its breach of contract counterclaim, having proven the existence of a valid, enforceable agreement, the Court does not

reach these alternative theories.  *See Di Simone v. CN Plumbing, Inc.*, No. 13-CV-5088, 2014 WL 1281728, at *6 (E.D.N.Y. Mar. 31, 2104).

G.  Management Recruiters' Damages

For the above reasons, Management Recruiters is entitled to recover damages in the amount of its Group Placement fee pursuant to the Fee Agreement, which sets a descending scale from 25 to 18 percent of the total annual base salaries of the placed attorneys.  The aggregate annual salaries of the 13 Kern Augustine attorneys who stayed after the Kern Augustine Transaction closed was $2,099,000; accordingly, under the Group Placements fee provision, Management Recruiters is entitled to a placement fee of $413,820 (25% of the first $400,000; plus 20% of the next $400,000; plus 18% of $1,299,000, the amount above $800,000).

While Meltzer Lippe provided testimony that several Kern Augustine attorneys had resigned within six months after the Kern Augustine Transaction closed, that does not impact the fee calculation under the Fee Agreement.  The six-month replacement credit guarantee, which Laffin negotiated up from Management Recruiters' standard 90-day replacement credit guarantee, provides that in the event a placed attorney resigns without cause or is terminated for just cause within six months of the placement, Meltzer Lippe is entitled to a credit against Management Recruiters' fee for finding and introducing a suitable replacement attorney. Moreover, it is contingent upon Meltzer Lippe's timely payment of the original placement fee. Meltzer Lippe did not seek a replacement attorney from Management Recruiters for any of the Kern Augustine attorneys who resigned, and did not pay any of the placement fee owed for the Kern Augustine attorneys.

H. Prejudgment Interest

In a diversity action, state law governs the award of prejudgment interest. *Schipani v. McLoed*, 541 F.3d 158, 164-65 (2d Cir. 2008). Under New York law, prejudgment interest is recoverable for breach of contract, as computed from the "earliest ascertainable date the cause of action existed." *See* N.Y. C.P.L.R. § 5001(a), (b). Management Recruiters is entitled to prejudgment interest at the rate of 9%, *see id.* § 5004, on the amount of the Group Placement fee. Management Recruiters requests prejudgment interest from March 11, 2016, although it does not specify how it determined that date. Nevertheless, that date is reasonable given that Meltzer Lippe commenced the underlying state action on March 8, 2016, seeking a declaration that it is not required to pay Management Recruiters in connection with the Kern Augustine Transaction.

### III. CONCLUSION

For the above reasons, Defendant Management Recruiters is entitled to judgment against Plaintiff Meltzer Lippe in the amount of $413,820, plus prejudgment interest at the rate of 9% computed from March 11, 2016 to the date judgment is entered; post-judgment interest shall accrue at the rate set forth in 28 U.S.C. § 1961. The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      September 27, 2018

_____
     /s/
Denis R. Hurley
United States District Judge